IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No. 06-cv-01205-WDM-MJW

OSCAR MUNOZ;
JUDI ALLEN;
JENNIFER BATER;
THOMAS A. CULLEN;
MILES L. DAVENPORT;
ROBERT FUEHR;
CLAUDIA GRAY;
W. DOUGLAS HICKEY;
DON A. JOHNSON;
BOB KOENIG;
ALAN KOENIGSBERG;
JERI L. KORSHAK;
STEVE LANG;
RONALD B. RINKLE;
DAVID G. SEYKORA; and
JERRY WOLFER,

    Plaintiffs,

v.

AT&T CORP., a New York corporation,

    Defendant.

## ORDER ON PENDING MOTIONS

This matter is before me on the three following motions for partial summary judgment: 1) Plaintiff Munoz's Motion for Partial Summary Judgment as to Liability (Dkt. # 62), filed June 26, 2007 together with his supporting brief and exhibits thereto (Dkt. # 63) ("Plaintiff's Motion"); 2) Defendant's Motion for Summary Judgment on Liability (Dkt. # 68), filed June 29, 2007 together with a supporting brief and exhibits

thereto (Dkt. # 69) ("Defendant's Motion"); and 3) Plaintiff's Motion for Summary Judgment as to Damages (Dkt. # 107), filed September 27, 2007 together with a supporting brief and exhibits thereto (Dkt. # 108) (Plaintiff's Damages Motion").

A Final Pretrial Order was entered on August 27, 2007. This case is set for a three-day trial to a jury commencing March 3, 2008. The three motions are fully briefed and a hearing on the motions will not materially assist in their determination.

**I.     BACKGROUND**

The named plaintiffs, including Plaintiff Oscar Munoz, filed their complaint alleging two claims for relief asserting breaches of contract by defendant AT&T. The First Claim for Relief is alleged on behalf of all plaintiffs other than Plaintiff Munoz; the Second Claim for Relief is limited to Plaintiff Munoz. By order dated September 12, 2006 (Dkt. # 29), the Court stayed this case as to the First Claim for Relief concerning all plaintiffs other than Plaintiff Munoz, because they were subject to arbitration. The Second Claim for Relief on behalf of Plaintiff Munoz, however, was not stayed (*see* Order entered January 25, 2007, Dkt. # 42).

Plaintiff is a former AT&T senior manager who began his employment with the company on January 5, 2001. Prior to commencing employment with AT&T, Plaintiff received an offer letter outlining the employment terms including a severance package that he would receive in the event of his separation from the company. As part of this offer, Plaintiff received AT&T stock options issued under the terms of the 1997 AT&T Long Term Incentive Program ("LTIP") (Final Pretrial Order, stipulated facts, ¶ 3). In July 2001, when AT&T split off its wireless business to form a separate company known

as AT&T Wireless Services, Inc. ("Wireless"), the options held by Plaintiff (and others) to acquire shares of AT&T stock were in part converted to options to acquire stock in Wireless (Final Pretrial Order, stipulated facts, ¶¶ 1-2; Complaint, ¶ 6).

Plaintiff's breach of contract claim arises from a separation agreement he entered into with AT&T when he left his employment with the company in February 2003 (Complaint, ¶¶ 13 (a), 29 and Exhibit B thereto) ("Separation Agreement"), which contains the following provision:

> Employee's AWE [Wireless] stock options vested on July 9, 2001. All unexercised AWE stock options will continue to be exercisable until the end of the stated term of such stock option or, in the event of death, in accordance with the stated death provisions of each applicable agreement. Employee's outstanding AWE stock options, as of August 16, 2002 are shown on the AWE Stock Option account statement which is incorporated herein and made a part hereof as Exhibit "D."

Separation Agreement, ¶ 3(g). At the time he separated from his employment with AT&T, Plaintiff held options to purchase up to 185,099 shares of Wireless stock at an exercise price of $12.9326 per share (Final Pretrial Order, stipulated facts, ¶ 3; *see also* Exhibit D to Separation Agreement).

In November 2003, reports began to appear in the media that Wireless was engaged in merger discussions. The price of the publicly traded Wireless stock rose from under $7.00 per share in mid-November 2003 to $10.99 per share two months later. In February 2004, Wireless agreed to be acquired by Cingular Wireless Corporation ("Cingular") in an all-cash deal for $15 per share. At the time, Cingular did not have publicly traded stock; it was a joint venture of SBC and BellSouth, then

separate companies. A merger agreement was signed in February 2004, at which time the proposed merger was announced publicly. The shareholders of Wireless approved the cash merger in May 2004. Final FCC approval was granted on October 26, 2004, and the deal closed the same day. Each share of Wireless stock was "converted" into the right to receive $15 cash. AT&T was not a party to this merger (Final Pretrial Order, stipulated facts, ¶ 5).

Plaintiff admits that after the split-off in June 2001, his rights and obligations in his Wireless options were governed by the 2001 AT&T Wireless Services, Inc. Adjustment Plan dated June 8, 2001 ("Wireless Adjustment Plan") (Exhibit 1 to Defendant's Motion). *See* Plaintiff's response to Interrogatory No. 3, attached as Exhibit 21 to Defendant's Motion, at 4. Section 4(c) of the Wireless Adjustment Plan provided that in the event of a merger affecting the company's shares, a compensation committee could make "such adjustments and other substitutions [to options relating to the company shares] as the Committee, in its sole discretion, deems equitable or appropriate . . . ." (Exhibit 1 to Defendant's Motion at 2, 8). In connection with the Cingular merger, the Wireless compensation committee exercised its right to adjust the options under the Wireless Adjustment Plan. To reflect what was happening to Wireless stock in the Cingular merger, the Wireless compensation committee adjusted all Wireless stock options into the right to receive the same $15 merger consideration provided to Wireless shareholders.

In September 2004, Wireless provided to Wireless option holders, including Plaintiff, a document titled Wireless Stock Option Summary ("option summary") (Final

4

Pretrial Order, stipulated facts, ¶ 6). The option summary contained the following provision:

> EXERCISE OF OPTIONS
>
> Unless you notify the Stock Plan Administrator prior to the close, you will be deemed to have exercised your options with the exercise prices of less than $15 per share on a "net basis", that is, you will not be required to pay the applicable exercise price, and will be entitled to a payment of $15 per share subject to each such option over the exercise price per share, less applicable withholding taxes. You will not be charged any commission or transaction fees.
>
> If you do not wish to have your options treated in this manner, you need to immediately notify the Stock Plan Administrator by writing to:
>
> Stock Plan Administrator
> AT&T Wireless
> RTC 5, Office 2221C
> 16661 NE 72nd Way
> Redmond, WA 98052
>
> In this case, your option to receive the $15 per share merger consideration in exchange for payment of the per share exercise price will remain outstanding for the remainder of the term of the option. However, note that (I) the $15 per share is fixed and is not increased by interest, and (ii) tax law requires the Company to report the cash you could have received to the IRS and you will be subject to taxes on that amount in the year in which the acquisition close occurs.

*See* Exhibit 3 to Munoz Declaration filed with Plaintiff's Motion (Dkt. 63; Exhibit A, part 2 at page 35). The option summary contained a section titled "Frequently Asked Questions About Option Payout" which provided the following additional information:

> Q. What do I need to do to exercise my options?
>
> A. Unless you notify the Stock Plan Administrator prior to the close, you will be deemed to have exercised your options with exercise prices of less than $15 per share on a "net basis," that is, you will not be required to pay the applicable exercise price, and will be entitled to a payment of $15 per share, subject to each such option over the exercise price per share, less applicable withholding taxes.

*Id.* at 36. As further discussed below, Plaintiff did not notify the Stock Plan Administrator that he did not wish his options to be treated as described in the option summary. Following the merger, Plaintiff received a payment from Wireless in the amount of $382,673.67 (less applicable taxes), representing the difference between the $12.9326 exercise price and the $15 per share merger consideration price for each of his 185,099 options (Final Pretrial Order, stipulated facts, ¶ 7).

In his claim for breach of contract Plaintiff alleges, that by virtue of the language in paragraph 3(g) of his Separation Agreement, AT&T guaranteed that his Wireless options would continue to be exercisable until the end of their stated terms, apparently 10 years. Plaintiff avers that AT&T breached that covenant when Wireless failed to pay the full value of his options to him in connection with the Cingular merger (Complaint, ¶¶ 29-30). Plaintiff contends that as a result of the Wireless-Cingular merger his options to purchase shares of Wireless stock "no longer existed" and he was "involuntarily deprived of the full economic value of his Wireless options." Final Pretrial Order at 7. He claims damages in the amount of $1,403,531.68 based on his expert's calculation of damages using the Black-Scholes valuation methodology (*id.* at 8).

## II. THE PARTIES' MOTIONS AND RESPONSES

Plaintiff argues that AT&T is liable to him under section 3(g) of the Separation Agreement for the loss of the economic value of the full term of his Wireless options. He states that the section clearly and unambiguously promises to him that each of his Wireless options shall "continue to be exercisable until the end of the stated term of such stock option." (Plaintiff's Motion at 9). AT&T's breach occurred, he claims, because in conjunction with the merger of Wireless with Cingular, his options were converted into options to acquire a liquidated sum of cash and he was forced to exercise those converted options only four years into their 10-year term (Plaintiff's Motion at 1-2). He contends that even though AT&T was not the direct cause of the loss of his Wireless options, AT&T is nevertheless liable to him as a result of the contractual obligations it undertook in the Separation Agreement (*Id.* at 2).

In support of his position, Plaintiff cites to arguments made by AT&T in a separate arbitration proceeding it commenced against Wireless on behalf of option holders,[1] and the results of a case brought in the Delaware Court of Chancery by a separate group of Wireless option holders.[2]

---

[1] As described by Plaintiff, in 2004 AT&T brought an arbitration proceeding against Wireless when AT&T learned of Wireless's intention to cancel the options. In that proceeding, AT&T argued that Wireless had breached agreements between those parties which required Wireless to either not cancel the options or, if Wireless did cancel the options, to replace them with a substitute of equivalent economic value (Plaintiff's Reply Brief, Dkt. # 78, at 2). According to defendant, however, the arbitration panel found that Wireless's adjustment of options was an "equitable or appropriate" adjustment authorized by the Wireless Adjustment Plan, and therefore determined that Wireless did not breach any obligations to option holders that arose either under the terms of the AT&T LTIP or the Wireless Adjustment Plan (Defendant's Motion at 16).

[2] As described by Plaintiff, AT&T, along with Wireless, was sued in 2004 in the Delaware Chancery Court by former executives of Media One (a case referred to as the "*Lillis*" case) on the basis that AT&T was liable, as a result of Wireless's cancellation of the options,

7

Defendant argues in opposition to Plaintiff's Motion, and in support of its own motion for summary judgment, essentially that Plaintiff's claim fails because section 3(g) provides no protection for *exercised* Wireless options, nor does that section require AT&T to ensure the preservation of the value of any of Plaintiff's Wireless options. Moreover, defendant contends, it is not liable for actions it did not take and could not control, and it was Wireless, not AT&T, which exercised its discretion in connection with the merger with Cingular to adjust Plaintiff's Wireless options. Defendant also points out that the arbitration panel in the proceeding with Wireless found that the adjustments to the options were equitable or appropriate, and that Plaintiff was not a party to the agreement which the Delaware court applied in the *Lillis* case. The determination of the arbitration panel is attached as Exhibit 20 to Defendant's Motion (Dkt. 69). The decision of the Delaware Chancery Court is attached to Plaintiff's Response (Dkt. # 78) as Exhibit D.

Defendant also argues, alternatively, that the release language contained in the Separation Agreement released any claims that Plaintiff had against AT&T regarding his Wireless options.

## III. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether a trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995). In other words,

---

for obligations AT&T undertook to the plaintiffs contained in a Media One stock option plan. On July 20, 2007 the Delaware Chancery Court entered an $11.3 million dollar judgment against AT&T, ruling that as a result of Wireless's cancellation and cash-out of the options, AT&T was liable to the *Lillis* plaintiffs (but not including Plaintiff Munoz) under the terms of the Media One stock option plan.

8

for the case to continue, "there must be evidence on which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A court grants summary judgment for the moving party only where there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits. F.R.Civ.P. 56(c). When applying this standard, a court must view the factual record in the light most favorable to the nonmovant. *Applied Genetics Int'l Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "However, where the non moving party will bear the burden of proof at trial on a dispositive issue that party must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (internal quotation marks and citation omitted).

IV.   ANALYSIS

It doe not appear that any of the material facts relating to Plaintiff's claim are in dispute. Rather, what the dispute centers on is the meaning of section 3(g) of the Separation Agreement which provides that it is to be construed and interpreted under the law of New Jersey (Separation Agreement, ¶ 17). In New Jersey, as in most jurisdictions, the interpretation or construction of a contract is usually a legal question

for the court, suitable for a decision on a motion for summary judgment. *See Driscoll Const. Co. v. State Department of Transportation,* 371 N.J. 304, 313 (N.J. Super. A.D., 2004). For the reasons set forth below, summary judgment should enter in favor of defendant and against Plaintiff on his breach of contract claim.

The Plaintiff's breach of contract claim rests solely on the language of paragraph 3(g). The operative language of that paragraph provides simply that "[a]ll unexercised AWE [Wireless] stock options will continue to be exercisable until the end of the stated term of such stock option . . . ." As noted above, when Wireless merged with Cingular, Plaintiff was provided with a stock option summary that gave him the right to notify the Stock Plan Administrator if he elected to not exercise his Wireless options. The option summary, and the frequently asked questions accompanying it, expressly advised Plaintiff that if he did not wish to have his options exercised in exchange for the $15 per option cash payment, he could retain the options by notifying the Stock Plan Administrator in writing. Had he done so, his option to receive the $15 per share merger consideration would remain in effect for the remainder of the term of the options. *See* Exhibit 3 to Munoz Declaration filed with Plaintiff's Motion (Dkt. 63; Exhibit A, part 2 at 35).

Plaintiff testified that he read the stock option summary when he received it (Deposition of Munoz, Exhibit 9 to Defendant's Motion (Dkt. # 69) at 80-81). Nevertheless, he refused to notify the Stock Plan Administrator by telephone or in writing because it would be inconvenient for him to wait on the telephone to reach the administrator, or because he recognized that even if he declined the $15 per option

10

cash payments he would be subject to income tax on the amount as if he had received it (*Id.* at 82-83).

As a result of his inaction, Plaintiff allowed the options to be exercised, and received the $382,673 consideration at the $15 per share price, while reserving to himself a perceived entitlement to afterwards "pursue issues" with AT&T or Wireless (*Id.* at 87). Even assuming that the merger terms presented Plaintiff with a Hobson's Choice of unacceptable alternatives, they were the terms of Wireless and Cingular, not AT&T. Remembering that the Separation Agreement merely confirmed that Plaintiff maintained his options to purchase Wireless stock from an entirely separate entity, if the acts of Wireless somehow impaired his preexisting options his remedies would seem to be against Wireless, the optionor company.

As it is, the Separation Agreement only provides that Plaintiff had option rights during the "stated term" of the option as to "<u>unexercised</u> AWE stock options." (Emphasis added.) Given that he exercised those options by his own inaction, the terms of his Separation Agreement with AT&T provide no basis for his contract claim against AT&T because no "unexercised AWE stock options" remained.

I note that Plaintiff has testified that he understood the 2003 Separation Agreement did not change his rights with respect to Wireless stock options, but rather that it kept his agreements "intact." *Id.* at 57-58. As of 2003, those Wireless options were subject to the 2001 Wireless Adjustment Plan which gave rights to the Wireless compensation committee to make adjustments, in its sole discretion as it deems equitable or appropriate, at the time of a merger. At the time of the Separation

Agreement the parties were thus mutually acknowledging the existence of options which were already subject to a plan giving Wireless the authority to make the very type of adjustment effectuated in the Cingular merger. Nothing in the Agreement articulates or implies any promise on the part of AT&T to somehow override the Wireless Adjustment Plan if Plaintiff disapproved.

Given Plaintiff's acknowledgment that the terms of the Wireless options preexisted the Separation Agreement,[3] the Separation Agreement expressly provides that Plaintiff has waived his rights to assert that somehow the Defendant breached the Separation Agreement because of some promise that preexisted the Agreement. The plain language of the Separation Agreement provides that the Plaintiff, as employee, waived and released "any and all claims . . . arising out of or related to his employment or termination of employment with AT&T" including "(b) claims (whether based on common law or otherwise) arising out of or related to any contract (whether express or implied)" . . . as well as any claim that AT&T "(d) otherwise acted unlawfully toward him." Waiver and General Release, Exhibit A to Separation Agreement, at 19, 20-21. The Agreement also contained merger language that it "fully supersedes" any prior agreement and that "all such prior agreements are null and void in their entirety and of no force and effect." Separation Agreement, ¶ 20. Under these circumstances,

---

[3] Plaintiff's later declaration, Exhibit J to Plaintiff's Response (Dkt. # 78), that he did not understand Wireless had the right to shorten the term of the options does not expressly disclaim his basic understanding that the Separation Agreement did not change the terms of the Wireless options. If a direct conflict is urged, then I conclude that such after-the fact reconstruction of a position may not be used to assert a genuine issue of fact that would preclude summary judgment. *See Burns v. County Com'rs of Jackson County,* 330 F.3d 1275, 1282 (10th Cir. 2003).

I conclude that the Plaintiff waived any claim based upon the acts of the Defendant prior to the Separation Agreement, including any participation in the Wireless Adjustment Plan.

Plaintiff also appears to argue that if AT&T's interpretation is correct, paragraph 3(g) would be rendered meaningless as it would have served no purpose, contrary to New Jersey contract law which requires every provision of an agreement to have some purpose. Thus, Plaintiff argues, the only purpose of paragraph 3(g) must have been to guarantee to Plaintiff the time value of the Wireless options (Plaintiff's Reply, Dkt. # 89, at 1; Plaintiff's Response, Dkt. # 78, at 5).

However, the paragraph certainly had a purpose other than as described by Plaintiff. It provided that Plaintiff's Wireless options would remain exercisable after he separated from his employment with AT&T. Plaintiff's options were "under water" at the time of his Separation Agreement in February 2003 as their exercise price was well above the market price of Wireless shares. By maintaining the options as exercisable, the Separation Agreement resulted in giving Plaintiff the opportunity to exercise those options in Fall 2004, after the price of Wireless shares rose yielding a payment to Plaintiff of some $382,673, hardly a meaningless effect.

Plaintiff further argues that AT&T's 's position in this case is inconsistent with the position it took in the arbitration proceeding with Wireless, and that AT&T should be estopped from arguing in this case contrary to what it argued to the arbitrators. While it is true that AT&T argued to the arbitrators that AT&T optionees were losing value as a result of the Wireless/Cingular merger, it is apparent from the arbitrators' decision that

13

AT&T was making that argument on behalf of the option holders who held options that were "under water," meaning that the exercise price of those option holders was greater than $15 per share. As the arbitrators stated in describing AT&T's position, "[t]hus the Wireless Cingular merger agreement had the effect of rendering valueless Wireless options with an exercise price in excess of $15 per share." (Exhibit 20 to Defendant's Motion, Dkt. # 69, at 4). However, as noted above, as a result of the proposed merger Plaintiff's options were no longer "under water," and therefore he was not part of the group of optionees on behalf of whom AT&T was making the argument in the arbitration. Moreover, whatever position AT&T may have taken in the arbitration, there is no dispute that the arbitrators found that the adjustment made by the Wireless compensation committee pursuant to Wireless Adjustment Plan preexisting the Separation Agreement was "equitable and appropriate." *Id*. at 5. The fact that AT&T made an argument in an arbitration on behalf of a group of optionees that did not include Plaintiff, and the fact that the argument was rejected, does not establish a basis for asserting an estoppel against AT&T in this case.

Finally, I conclude that the opinion of the Delaware Chancery Court in the *Lillis* case does not require an interpretation of the Separation Agreement as advanced by Plaintiff, and in fact supports a quite different interpretation. In the *Lillis* case, the plaintiffs were former executives of Media One Group who brought their lawsuit under a particular stock plan, referred to as the Media One 1994 Plan or simply the "1994 Plan." That plan required AT&T to maintain the option holder's "economic position"

14

with respect to the options. The 1994 Plan did not cover Plaintiff as he was not a Media One executive and held no options governed by the 1994 Plan.

After the series of transactions with Wireless and the merger with Cingular described above, the Media One executives brought suit alleging that they had been improperly deprived of part of the economic value of those options by the terms of the Cingular merger. *See* Opinion of Delaware Chancery Court, Exhibit D to Plaintiff's Response (Dkt. # 79), at 4-5. In finding for the plaintiffs in the *Lillis* case, the Chancery Court interpreted the Media One Plan as creating a result that was contrary to the general rule that a stock option "is tied to the value of the security into which it is exercisable." *Id.* at 4. The Chancery Court found that the Media One plan was "at variance with this general rule" so that the terms of "that plan" were breached by the adjustments made to the former executives' options. *Id.*

In reaching this result, the Delaware Court relied on the provision in the Media One Plan that guaranteed to the executives their "economic position," understood by the Delaware Court to mean the "full economic value of the options." *Id.* By contrast, Plaintiff's Separation Agreement has no such similar language as that contained in the Media One Plan. Plaintiff seeks to convert paragraph 3(g) into such a provision, but it simply does not state what the Media One Plan stated. Accordingly, the decision in *Lillis* does not control.

For the reasons set forth above, the Court finds that summary judgment should be entered in favor of defendant and against Plaintiff on his claim for breach of contract

based on paragraph 3(g) of the Separation Agreement. Plaintiff's Motion For Summary Judgment as to Damages (Dkt. # 107) is moot.

Accordingly, it is Ordered:

1. Plaintiff Munoz's Motion for Partial Summary Judgment as to Liability (Dkt. # 62), filed June 26, 2007, is DENIED.

2. Defendant's Motion for Summary Judgment on Liability (Dkt. # 68), filed June 29, 2007, is GRANTED.

3. Plaintiff's Motion for Summary Judgment as to Damages (Dkt. # 107), filed September 27, 2007, is DENIED as MOOT.

4. Defendant may have its costs.

DATED: February 15, 2008

BY THE COURT:

s/ Walker D. Miller

_____
Walker D. Miller
United States District Judge